EXHIBIT A

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

JOSLYN ROBINSON            :   CIVIL ACTION
                           :   NO:  3:02CV2120 (AWT)
vs.                        :
                           :
OFFICER HENDERSON,         :
THE CITY OF HARTFORD,      :
BRUCE MARQUIS,             :
JOHN DOE OFFICERS          :   MARCH 24, 2004

DEPOSITION OF:  JOSLYN ROBINSON

APPEARANCES:

FOR THE PLAINTIFF:

        FREEMAN LAW FIRM
        21 Oak Street, Suite 203
        Hartford, Connecticut 06106-1513
        (860) 249-4444
BY:  DERON D. FREEMAN, ESQUIRE

FOR THE DEFENDANTS:

        HALLORAN & SAGE, LLP
        One Goodwin Square
        225 Asylum Street
        Hartford, Connecticut 06103
        (860) 522-6103
BY:  JAMES J. SZEREJKO, ESQUIRE


        Leigh Gershowitz, License No. 306
         Certified Realtime Reporter
         Registered Merit Reporter
          NIZIANKIEWICZ & MILLER
             (860) 291-9191
            972 Tolland Street
        East Hartford, CT  06108-1533


                NIZIANKIEWICZ & MILLER
                   (860) 291-9191

1          . . . . Deposition of JOSLYN ROBINSON, a witness,

2     taken on behalf of the Defendants, OFFICER HENDERSON,

3     OFFICER MARTINEZ, OFFICER JOHNSON, CITY OF HARTFORD,

4     AND BRUCE MARQUIS, in the herein before entitled

5     action, pursuant to the Federal Rules of Civil

6     Procedure, before Leigh Gershowitz, duly qualified

7     Notary Public in and for the State of Connecticut and

8     Commonwealth of Massachusetts, held at the offices of

9     Halloran & Sage, LLP, One Goodwin Square, 225 Asylum

10    Street, Hartford, Connecticut 06103, commencing at

11    2:00 p.m. on Wednesday, March 24, 2004.

12                      * * * * *

13              S T I P U L A T I O N S

14

15        It is hereby stipulated and agreed by and among
      counsel for the respective parties that all
16    formalities in connection with the taking of this
      deposition, including time, place, sufficiency of
17    notice, and the authority of the officer before whom
      it is being taken may be and are hereby waived.

18        It is further stipulated and agreed that
      objections other than as to form are reserved to the
19    time of trial.

20        It is further stipulated and agreed that the
      witness will read and sign the deposition.
21

22        It is further stipulated that the proof of the
      qualifications of the Notary Public before whom the
23    deposition is being taken is hereby waived.

24                      * * * * *

25

3

```
1                          I N D E X
2     WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS
3
4     JOSLYN ROBINSON        *4
5       *MR. SZEREJKO
       **MR. FREEMAN
6
7     EXHIBITS:           DESCRIPTION               PAGE
8
                       No exhibits
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    JOSLYN ROBINSON, the Deponent, having been

2  first duly sworn, deposes and says as follows:

3                        * * * * *

4    DIRECT EXAMINATION BY MR. SZEREJKO

5    Q.    Hi, Mr. Robinson.

6    A.    How you doing?

7    Q.    My name is James Szerejko.  I represent the

8  defendants in this lawsuit.  And we're here for

9  purposes of your deposition.  You're aware you're

10  under oath and we have a record being taken of the

11  questions and answers.  So as a result, when I put

12  questions to you, if you could answer using words --

13  sometimes we communicate with hands, gestures, shrugs,

14  "uh-huhs" and things of that nature that are very

15  difficult to pick up on a record -- so please answer

16  with words.

17        And also, I will try to avoid talking when

18  you're talking, if you could show me the same

19  courtesy.  And the reason for that is, if we're both

20  talking at the same time, the stenographer can't get

21  that accurate account of what's said, so we'll go back

22  and forth.  If at any point in time you do not

23  understand my question, please let me know.  If you do

24  answer the question, I can only assume that that is

25  the answer that you wanted to supply to the question I

5

1 give.

2      Do you have any questions for me before we

3 begin?

4      A.   No.

5      Q.   All right.  And then what I'm asking

6 you -- about to ask you is not to in any way invade

7 your privacy, not to in any way insult you, but just

8 to see if we have the ability to make a clear record.

9 Have you consumed any alcohol, any narcotic, any

10 medication, anything today that might affect your

11 ability to participate in this deposition?

12      A.   No.

13      Q.   We'll do a little bit of background and then

14 I'll ask you some questions about the incident itself.

15 If at any point in time you need to take a break,

16 please let me know and we'll accommodate that.  I only

17 ask that you not take a break while the question is

18 pending, finish that segment and then we can take a

19 break.

20           MR. SZEREJKO:  And I didn't mention at

21 the outset -- I guess the usual stipulations will

22 apply?

23           MR. FREEMAN:  That's fine.

24 BY MR. SZEREJKO:

25      Q.   Will you please give your date of birth?

NIZIANKIEWICZ & MILLER
(860) 291-9191

1    A.    5/15/82, 1982.

2    Q.    And I noticed when you answered the

3    interrogatories you said 5/18/88?

4    A.    5/15, 1982.

5    Q.    It said 5/15/88.  So that must have been a

6    typo.  Your year of birth is 1982, correct?

7    A.    Yes.

8    Q.    And where did you grow up?

9    A.    Hartford, Connecticut.

10   Q.    What schools did you attend?

11   A.    I don't remember preschool.  I went to

12   Martin Luther for elementary school.  Fox Middle for

13   middle school.  And Weaver High School for high

14   school.

15   Q.    And did you graduate from Weaver?

16   A.    Yes, I did.

17   Q.    What year, sir?

18   A.    2001.

19   Q.    And it's my understanding you went on to

20   school after Weaver; is that correct?

21   A.    Yes, I did.

22   Q.    And where did you attend school after

23   Weaver?

24   A.    University of New Haven.

25   Q.    And are you presently a student there?

1    A.    Yes, I am.

2    Q.    And what year are you at the University of

3    New Haven?

4    A.    I'm a junior.

5    Q.    And at this point, do you have a major?

6    A.    Sports management.

7    Q.    And when is your intended graduation date?

8    A.    It was 2005.

9    Q.    When you say "was," is it --

10    A.    Because my school cancelled its football

11    program.  And I was a member of the football team.  So

12    I'm in the process of transferring, if I can transfer,

13    to another school.

14    Q.    If you were to stay at UNH, you would

15    graduate in '05?

16    A.    December, '05.

17    Q.    Where are you applying for school at this

18    time for transfer?  Do you have any idea?

19    A.    Southern University and Western Connecticut.

20    Q.    So West Conn. and Southern Connecticut?

21    A.    Yes.

22    Q.    And you graduated from Weaver in June of

23    '01?

24    A.    Yes.

25    Q.    Since you graduated from Weaver, have you

1    been a full-time student?

2        A.    Yes, I have.

3        Q.    Have you been working at all while a

4    student?

5        A.    No, I haven't.

6        Q.    Did you work at all in high school?

7        A.    A couple of times.

8        Q.    And just part-time jobs?

9        A.    Yes.

10       Q.    And where did you work while in high school?

11       A.    Output Technologies in East Hartford,

12   Athletes Foot in -- I think it was West -- I believe

13   it was West Hartford.  And I worked at Sneaker Stadium

14   in West Hartford.

15       Q.    And this would be just, like, student

16   jobs --

17       A.    Yeah.

18       Q.    -- while you were going to school to

19   supplement or to pay for your tuition?

20       A.    Yeah.

21       Q.    Have you had any full-time summer jobs since

22   leaving Weaver?

23       A.    Part-time summer job.  I had a part-time

24   summer job this past summer at Filene's warehouse.  It

25   only lasted for four weeks, three weeks.

1    Q.    And how about in either the other two

2  summers?  You've been out of school since '01.  So

3  summer of '02, summer of '03.

4    A.    A couple of, what do you call it, temp

5  agency jobs, but, like, on and off, like a week and

6  then three weeks you're not working and then they call

7  you for another week and you work for a couple of days

8  and then they wouldn't call anymore.  So just temp

9  agency jobs.

10    Q.    So, I take it, as part of the lawsuit that

11  brings us here today, Mr. Robinson, you're not making

12  a claim for lost wages, correct?

13    A.    For lost wages?  I wasn't really working no

14  big jobs because I was always school oriented.  I was

15  always being an athlete, doing something after school,

16  so there was really not too much time to work.

17    Q.    Right.  And that's the point.  I noticed

18  that you were not working at the time, so you're not

19  making a claim for lost wages?

20    A.    At the time when this accident?

21    Q.    Right.

22    A.    Don't get me wrong, I did have a job at the

23  time that it happened, yes, I did.

24    Q.    And do you recall the date of this incident?

25    A.    It was July 27th, 2001.  It was a Friday.

1    Q.    And where were you working at the time?

2    A.    Sneakers store in Buckland's Mall.

3    Q.    What's the name of the store?  That's it,

4    Sneakers Store?

5    A.    No.  Athletes Foot.  Sorry.

6    Q.    And did you lose any income from Athletes

7    Foot as a result of this incident?

8    A.    I believe I missed three days.

9    Q.    Okay.  And what would the value of that be

10   for missing three days; do you recall?

11   A.    I can't remember.

12   Q.    When you filed the answers to

13   interrogatories, you said you were unemployed at the

14   time of this incident.  But now you're saying you were

15   employed at the time of the incident?

16   A.    Yes, I was.

17   Q.    Okay.  Do you recall the time of this

18   incident?

19   A.    No, I don't.

20   Q.    Do you recall what you did that day prior to

21   the incident?

22   A.    Picked up my girl from work and brought her

23   to my house.

24   Q.    And who were you living with at the time?

25   A.    My mother.

1    Q.   Anyone else?

2    A.   My aunt and my little brother.  He's 17.  He

3 was 17 at the time.

4    Q.   And what was the address where you lived at

5 the time?

6    A.   36 Burton Street.

7    Q.   And is that where the incident happened?

8    A.   No.  It happened at the corner.  It happened

9 on Burton Street but not in front of my house, at the

10 corner.

11    Q.   So it was fairly close to your house?

12    A.   Yes.

13    Q.   And who was your girlfriend at the time?

14    A.   Sharelle Williams.

15    Q.   And are you still in touch with her?

16    A.   Yes, I am.

17    Q.   And do you know her address?

18    A.   Yes, I do.

19    Q.   And what's her address?

20    A.   Is it a must that I give it to you?

21    Q.   Yeah.  She's identified as a witness in this

22 case.

23    A.   49 West Euclid.

24    Q.   Excuse me?

25    A.   49 --

1    Q.    West Euclid?

2    A.    Yes.

3    Q.    In Hartford?

4    A.    Yes.

5    Q.    Is she still your girlfriend?

6    A.    Yes, she is.

7    Q.    And you intend to have her as a witness if

8    this matter goes to trial?

9    A.    Yes, I do.

10    Q.    How long has she been at that address?

11    A.    All my life.

12    Q.    I mean the West Euclid address.

13    A.    Oh, her?

14    Q.    Yeah.

15    A.    I can't tell you.

16    Q.    But was she living there at the time of this

17    incident?

18    A.    Yes, she was.

19    Q.    So for several years, correct?

20    A.    Yes.

21    Q.    And is she presently employed?

22    A.    Yes, she is.

23    Q.    And where does she work?

24    A.    Stop & Shop.

25    Q.    Which one?

1      A.   South Windsor.

2      Q.   I realize you don't recall the exact time,

3 sir, but do you recall if this incident happened in

4 the morning, the afternoon, or in the evening?

5      A.   In the evening.

6      Q.   And was it dark out?

7      A.   Not at the time.

8      Q.   The incident itself, is it fairly clear in

9 your mind?

10     A.   I can remember bits and pieces.  I can tell

11 you as much as you can.  All you got to do is ask

12 questions.  I'll answer the ones that I can.

13     Q.   Where were you coming from when the incident

14 happened?

15     A.   From the corner store.  I left the

16 corner -- my mom asked me to get a soda.  I jumped in

17 the car, me and my girl.  I drove up the street,

18 parked the car, went inside the corner store, came out

19 with the soda.  Left the car at the corner with her

20 sitting in the car, took my shirt off, threw it in the

21 car because it was hot outside.  Ran down the street

22 with the soda in my hand, cell phone on my hip.  Gave

23 my mom the soda, walked out of my yard, said a couple

24 of words to my friend on the way up the street.  Cross

25 the street, back on my side of the road.  I ran up the

1  street and jumped inside the car.

2      Q.    All right.  We'll take that step-by-step.

3  That's what I was trying to figure out, why you had

4  the car and it wasn't parked in front of your house,

5  but you had used the car to go from your house to the

6  corner store?

7      A.    Go up to the street, yeah.

8      Q.    And the corner store is where, Albany

9  Avenue?

10     A.    Right at the corner of Burton and Albany

11 Avenue.

12     Q.    About how far down the street do you live?

13     A.    I live, like I said, in the middle of the

14 street.

15     Q.    So that would be like halfway between

16 Homestead and Albany?

17     A.    Yes.

18     Q.    If you're facing north towards Albany, are

19 you on the right side of the street or the left side?

20     A.    If it's facing Albany, I'm on the right

21 side.

22     Q.    So that would be the east side of Burton

23 Street?

24     A.    If you say it's the east.  I said I'm on the

25 right side facing Albany Avenue.

1    Q.    And it's a one-way street?

2    A.    It's a one-way street.

3    Q.    And when you drove up the street, you left

4    Sharelle and the car there and you came back with the

5    soda, right?

6    A.    Yes, from the store.

7    Q.    And when you first had contact with the

8    police, was that when you were coming from the store?

9    A.    No.  That was after I had already given her

10   the soda and came back to the car.

11   Q.    And you were going back, all right.

12         And, I take it, that the reason you ran back

13   was because you didn't want to go the wrong way on the

14   one way street, so you just left the car there and you

15   ran back up the street with the soda?

16   A.    Right.

17   Q.    And were you going to leave somewhere from

18   there to take off?

19   A.    I was leaving from the corner.  I don't hang

20   out on the corner.  That's not a spot for me.

21   Q.    No.  But I'm saying -- the point is you were

22   on your way somewhere with Sharelle and you got the

23   soda on the way or were you going to go around

24   the bend and come back?

25   A.    No.  What I was doing was getting the soda

1    for my mom, getting the soda to my mom, and then me

2    and Sharelle was going to go about our business, after

3    she had already gotten the soda. But that never

4    happened.

5        Q.    Okay. That's what I was getting at. When

6    you say going about your business, where were you

7    about to go?

8        A.    We were going out to eat. She had just got

9    her license.

10       Q.    And what you did is just, for your mother,

11   you got the soda before you left, correct?

12       A.    Yes, I did.

13       Q.    All right. Now, you had mentioned that you

14   had taken your shirt off and you had the soda in one

15   hand, cell phone in the other or cell phone on your

16   belt?

17       A.    On my hip. On my hip, attached to my

18   sweatpants, cell phone on my hip, shirt off, soda in

19   my hand.

20       Q.    Anything in your hand besides the soda?

21       A.    Soda in my hand, cell phone on my hip

22   clipped to my sweatpants.

23       Q.    Okay. But you talk about the soda in your

24   hand. Anything in the other hand?

25       A.    Nothing in my hand.

1   Q.   The keys to the car were in the car --

2   A.   In the car with Sharelle.

3   Q.   And how long did it take you to go from the

4   car at the corner back to your house with the soda?

5   A.   A couple of minutes.  A couple of minutes.

6   Q.   And then when you got there --

7   A.   When I got where?  Where is there?

8   Q.   Okay.  Now, I'm trying to go through this

9   easy with you.  Understand, I'm not here to argue with

10  you.  I'm trying to just go and ask questions.  So

11  that requires your cooperation.

12       When you got back to the house, did you go

13  upstairs or was your mother up front?

14  A.   My mom was on the porch.

15  Q.   That's where you gave her the soda, correct?

16  A.   Yes.

17  Q.   And then what did you do?

18  A.   I left out my yard, walked out, going up the

19  street, said a couple of words to my friend, ran,

20  started running up the street and got in the car and

21  was making an attempt to pull off.

22  Q.   Okay.  Now, who was the friend you said a

23  few words to?

24  A.   Shawn Pinto.

25  Q.   And that's one of the witnesses you

1    identified, too, correct?

2        A.    Yes.

3        Q.    And where does Shawn live?

4        A.    Across the street from me.  A couple of

5    houses up.

6        Q.    Is he still there?

7        A.    Yes.  He does still live there.

8        Q.    Do you know the street number?

9        A.    I don't even know.

10       Q.    Because for -- when you described him in the

11   interrogatories, you just had his name, but you said

12   address unknown.  So you don't know the address?

13       A.    I don't want to give you a wrong number and

14   it's another number.  So I don't know the address.  I

15   know the color of the house.  If you want to know the

16   color of the house, it's blue with the black fence

17   around it.

18       Q.    And that would be the opposite side of the

19   street from where you live?

20       A.    Yes, the left side.  I live on the right

21   side.

22       Q.    And do you recall what you said to Shawn?

23       A.    No, I don't.

24       Q.    Do you recall what he said to you?

25       A.    No, I don't.

Q.    And then did you run back or walk back to the car?

A.    I ran right back to the car.

Q.    And what happened when you got to the car?

A.    I jumped in the car, closed the door.  When I closed the door, put the car in drive, started to drive off and a blue van just closed me in and I couldn't move, couldn't go nowhere.  So I threw the car back in park.

Q.    Did you recognize anyone in that van?

A.    No, I did not.

Q.    Did you have any idea what was going on?

A.    No, I did not.

Q.    What did you say?  What did you do at that point?

A.    They started talking to me first.  I didn't say nothing until they said anything to me.

Q.    And when you say "they," who is they?

A.    The people who jumped out of the van.  I don't know what they were.

Q.    And how many jumped out of the van?

A.    It was five of them.

Q.    Were they men, women, mixed?

A.    They were men.

Q.    White, black, Hispanic?

1     A.   White, black, and Hispanic.

2     Q.   And there were five of them in the van?

3     A.   I believe so.

4     Q.   And do you recall what the racial makeup was

5 of each, like, how many blacks, how many Hispanics,

6 how many whites?

7     A.   I know it was one black.  It was either two

8 whites and two Hispanics or vice -- or three whites

9 and one Hispanic.  I don't remember.  But I know it

10 was one black for sure.

11     Q.   Did these men say anything to you?

12     A.   First, when they pulled up to the car, the

13 black one and the -- I believe it was a Hispanic

14 one -- jumped out and said, "Get the fuck out of the

15 car."  I told them, "I'm not getting out of the car.

16 I don't know who you are.  I'm not going nowhere."  He

17 say, "Get the fuck out of the car," started yelling at

18 both me and my girl.  They both started yelling, "Get

19 the fuck out of the car."

20     I believe one or two more jumped out.  They

21 kept saying, "Get the fuck out of the car."  The

22 driver's side window on the blue car that I was

23 driving does not roll down.  The back window, which

24 was to my side, was rolled down, so the black guy --

25 the black cop, I guess he's a cop, he started reaching

1    his hand through the other window, the back window,

2    grabbed me, trying to pull me out.  So I told him,

3    "Get the fuck off me, get off of me."

4         So I opened the door.  I stepped out of the

5    car.  When I stepped out of the car, the first thing

6    he do was push me up against the car, turned me over,

7    put my hands on the car and started searching me.  I

8    hit his hand, sort of, "Get off of me.  I don't know

9    what you're doing.  Get off of me.  I don't got

10   nothing.  Who are you?  Get off of me.  Get the fuck

11   off of me."  While two other cops were arguing with my

12   girl, talking to my girl, I'm telling him, "Get off of

13   me.  Get the fuck off me."

14         By this time, my parents and everybody else

15   and witnesses were coming up the street --

16              MR. FREEMAN:  I'm going to stop you

17   right here, Joslyn.  There's no question.  Just wait

18   until he asks you a question.

19              THE WITNESS:  All right.

20   BY MR. SZEREJKO:

21      Q.   Keep on going.  Go ahead.

22              THE WITNESS:  Continue?

23              MR. FREEMAN:  Just wait until he asks

24   you a question.

25              THE WITNESS:  All right.

1   BY MR. SZEREJKO:

2        Q.   So what happened next?

3        A.   Ask a question.

4        Q.   I just did.  What happened next?  That's a

5   question.

6                 MR. FREEMAN:  You can go ahead and

7   answer.

8        A.   Where was I?

9   BY MR. SZEREJKO:

10       Q.   You were explaining how this -- you were

11  telling him to get off you and --

12       A.   Right.  I kept telling him, "Get off me."

13  He said to me, "Oh, you're a wise guy."  And I'm like,

14  "Wise guy for what?"  He's like -- "get off me."  All

15  of this time while this was going on, I wasn't

16  cooperating with him, there was no rights read to me.

17  I saw no badges.  They didn't even have on -- what do

18  you call it -- police attire.  They had on regular

19  clothes.  I didn't see no badges.  There were no

20  rights read to me or nothing.

21                 So I hit his hand off the last time.  He

22  said, "Oh, you want to be a wise guy?  You want to be

23  a wise guy?"  He grabbed me, he picked me up, slammed

24  me on the ground on my back and then dragged me by my

25  legs away from the car, turned me over, and then came

1   down on me with his two knees in my back.  And that's

2   when he cuffed me.

3        Q.    Now, at any point in time during what you

4   just described, did any of those five men identify

5   themselves as police officers?

6        A.    Nobody said they were police officers.

7   Nobody read me their rights.  Nobody showed me any

8   badges.

9        Q.    And, clearly, they were not in uniform?

10       A.    No.

11       Q.    Did you have any idea that they were police

12  officers?

13       A.    No, I did not.  I have no reason to because

14  I'm not doing anything wrong.  I wasn't doing

15  anything.  I was going about my business, going to

16  take my girl out to eat.

17       Q.    Did any of them say they suspected you had a

18  gun?

19       A.    Yes, they did.

20       Q.    At what point did they tell you that?

21       A.    They said they saw me with a gun when I was

22  running up the street.

23       Q.    And at no point after telling you that did

24  they say that they were police officers?

25       A.    No.

1    Q.    When did they first say they were police
2    officers?

3    A.    They never said they was police officers
4    until when I got -- when they bring me to Keney Park.

5    Q.    Did any uniformed officers show up on Burton
6    Street?

7    A.    They eventually called uniformed officers
8    when I was off the scene.  But when I was on the
9    scene, I don't recall seeing any uniformed officers.

10    Q.    So you didn't see any police cruisers,
11    marked cruisers, people in uniform show up when you
12    were on Burton?

13    A.    I don't recall seeing marked police
14    cruisers.  I recall them throwing me in the van after
15    a while.

16    Q.    And what you just described, in terms of you
17    being thrown to the ground, what happened when you
18    were on the ground?

19    A.    He had his hand -- he had his knees in my
20    back.  After he cuffed me, he was pushing my head down
21    in the ground, asking me, "Where is the gun," when I
22    was cuffed.  And I had no gun.  I had my cell phone on
23    my hip.  That's what he found, my cell phone, with
24    money in my pocket and, if you really want to know, a
25    roll of condoms with, like, ten condoms on it.

1      Q.    And in terms of the individual that was

2   doing that, which of the five was the one on your

3   back?

4      A.    Detective Henderson, the black cop.

5      Q.    How do you know his name?

6      A.    I remember his name now.

7      Q.    Had you ever had any contact with Detective

8   Henderson prior to this?

9      A.    No.

10     Q.    Had you ever had any contact with any of the

11  other guys in the van prior to this?

12     A.    No.

13     Q.    Have you ever had any contact with the

14  Hartford police prior to this?

15     A.    No.

16     Q.    Have you ever been arrested before?

17     A.    No.

18     Q.    Anywhere?

19     A.    No.

20     Q.    When you were on the ground, sir, and he has

21  his knee in your back, did he handcuff you?

22     A.    Yes.  He handcuff me.  When he was on my

23  back, that's when he handcuffed me.

24     Q.    And at that point in time, did you begin to

25  think that maybe he was a police officer?

1  A.   That's when I -- of course I realized it

2  when I was being cuffed.

3  Q.   That's what I'm wondering.  At what point

4  did you finally --

5  A.   That's not what you asked me.

6  Q.   Well, let me go through that again.

7  At what point did you begin to realize that

8  this was a police officer?

9  A.   When he was cuffing, when I was being

10  cuffed, when I was on the ground being cuffed, after I

11  got slammed.

12  Q.   And did you sustain any injuries as a result

13  of being slammed?

14  A.   When I got slammed, my eye was swollen.  I

15  couldn't see out of my eye and I had scars on my back.

16  I believe the lawyers took pictures of those.

17  Q.   Do you have any idea how you got the scars

18  on your back?

19  A.   When he dragged me.  I had no shirt on, so

20  he slammed me on the concrete on my back and then

21  dragged me on the concrete away from the car that I

22  was driving, didn't flip me over.

23  Q.   And when you first were slammed to the

24  ground, Mr. Robinson, what part of your body hit?

25  A.   My back and my legs.

1      Q.    So when he threw you to the ground, he threw

2   you down on your back?

3      A.    Yes.

4      Q.    And did the back of your legs get scraped

5   up, too?

6      A.    I had on sweatpants.

7      Q.    So it was just your back --

8      A.    Yeah.

9      Q.    -- that was the part that was exposed?

10     A.    Yes.

11     Q.    And any other parts of your body that were

12  injured?

13     A.    When he flipped me over and he was pushing

14  my head on the concrete, my eye was swollen.  And I

15  had a scar on my eye and my eye was swollen from being

16  hit -- my face being hit on the concrete.

17     Q.    And you gestured, so the record is clear,

18  that would be your left eye?

19     A.    Yes, it was.

20     Q.    And did you have any injuries besides the

21  scrapes on your back and the injury under your left

22  eye?

23     A.    No.

24     Q.    Did you receive medical attention for those

25  injuries?