54

1    Q.    Anything else that you can think of,
Mr. Robinson?

3    A.    That's it.

4        MR. SZEREJKO:  I just want to look at
5    my notes.

6    (A recess was taken at 2:51 p.m. until 2:53 p.m.)
7    BY MR. SZEREJKO:

8    Q.    Mr. Robinson, getting back to the incident
9    when you were on Burton Street when these men jumped
10   out of the van, at any point in time did you attempt
11   to run away from them?

12   A.    No.  All I did was hit his hand off.  No, I
13   did not try to run away from him.

14   Q.    And I take it that you hit his hand off,
15   when you say, "hit his hand," you mean Henderson's?

16   A.    Yes.

17   Q.    And that would be when he was in the course
18   of attempting to pat you down and search you?

19   A.    Yes.

20   Q.    At any point in time did you yell to your
21   friends or anyone who was nearby that you were being
22   subjected to police brutality?  Did you try to in any
23   way encourage people to help you?

24   A.    I yelled to one of my boys to go get my
25   mother.  That's the only thing I said.

NIZIANKIEWICZ & MILLER
(860) 291-9191

1    Q.    And which one was that?

2    A.    I don't remember -- I don't remember which

3  one went and got them.  I just yelled -- there was

4  three brothers outside.  I just yelled, "Yo, go get my

5  mother."  The next thing you know, my mother, my

6  uncle, my aunt, and my brother were coming up the

7  street, not to mention everybody else who was outside

8  who wanted to know what was going on.

9    Q.    How much of a crowd gathered when this

10  incident took place?

11    A.    A big crowd.

12    Q.    Do you have any idea how many people?

13    A.    No.  A big crowd.

14    Q.    Do you know the people that were in the

15  crowd?

16    A.    Some of the people.  Some of the people were

17  from the street.  Some of the people were from -- just

18  from around the area that I know from just seeing them

19  outside.

20    Q.    And what family members were there,

21  Mr. Robinson?

22    A.    My mother, my aunt, my uncle and my little

23  brother.

24    Q.    And what's your aunt and uncle's name?

25    A.    My uncle's name is Victor Canes.  My aunt's

1    name is Annette Canes.  And my mother's name is

2    Barbara Canes.

3         Q.    And what's your brother's name?

4         A.    My little brother's name is Mark Canes.

5         Q.    Do you have any idea what the cost was for

6    the medical treatment that you received at the

7    physical therapist and St. Francis Hospital?

8         A.    No.

9              MR. SZEREJKO:  And at the time he

10   indicated he wasn't working, so there was nothing

11   signed for employment authorization.  If he is making

12   a claim for lost wages, then I'd like to follow up

13   with that Athletes Foot.

14             MR. FREEMAN:  Okay.

15             MR. SZEREJKO:  So we'll get an

16   employment authorization signed.

17             MR. FREEMAN:  Sure.

18   BY MR. SZEREJKO:

19        Q.    Did you go to St. Francis Hospital the next

20   day or was it the same night; do you remember?

21        A.    The time change over, so if you -- you can

22   call it whatever you want to call it.  I call it the

23   same day.  If you want to call it the next day, you

24   can because the time change over.

25        Q.    So it might have been after midnight when

1    you went to the hospital?

2        A.    Right.

3        Q.    But the point is, you didn't go home, take

4    it easy, forget about it, and go back the next day,

5    you just got cleaned up and you went there?

6        A.    No.  I didn't even get cleaned up.  I went

7    there just like that, fresh from the cell.  I went to

8    my house and then jumped in the car and went to the

9    hospital.

10       Q.    Now, once again, sir, the interrogatories

11   that I've referred to, those were the ones where

12   questions were asked and you answered them and that

13   was all done through your attorney's office.  Rather

14   than a physical therapist, there's a chiropractor's

15   office at 360 Main Street, Wagner Chiropractic Center;

16   is that where you went?

17       A.    Okay.  If that's what you have, then that's

18   where I went.

19       Q.    And 360 Main Street, that would be down by

20   Buckingham Street, in that area?

21       A.    I don't know where Buckingham Street.

22       Q.    Do you know where Herb's Sports Shop is?

23       A.    Yes, I do.

24       Q.    Was it down by there?

25       A.    If that's the address, then I guess so.

1    Q.    And the days that you missed from work, sir,

2    was it all together, like one, two, three, or did you

3    take a day off here, a day off there or was it three

4    days out of work after the incident?

5    A.    It was them three little days.  And then

6    after them three little days, it was time for me to

7    get ready to go to college.  So I didn't really go

8    back to work.  I went went to work a week after that.

9    And then after that I didn't go back because I started

10    to move back to college.  Not even move back.  Sorry.

11    Move into college because that was my intern freshman

12    year, freshman semester.

13    Q.    That's right.  Because you graduated from

14    Weaver in '01?

15    A.    2001, right.  And then I went straight to

16    college in August of '01.

17    Q.    By the way, what position do you play in

18    football?

19    A.    Corner back.

20    Q.    Did you argue at all with the police

21    officers when you were there on Burton Street?

22    A.    When they was searching me, I was telling

23    him get his hands off of me because he ain't got no

24    business touching me.

25    Q.    And you're absolutely certain that he never

1    said he was a police officer?

2        A.    They never read any rights, never said --

3    they never -- put it like this:  They never identified

4    themselves as officers, FBI, undercovers, dicks,

5    nothing.

6        Q.    And it was you who -- once they began to

7    handcuff you, then you realized they were police

8    officers?

9        A.    Right.

10        Q.    Who is Mark E. Julius?

11        A.    Oh, that's one of my friends.  He went to

12    high school with me.

13        Q.    Was he one of the ones out there that day?

14        A.    Yeah.  He was out there.

15        Q.    And who is Shawn Pinto and Ian Pinto?

16        A.    Those are two brothers.  Those are the ones

17    that live in the blue house on the left side of the

18    street.

19        Q.    With the black fence, right?

20        A.    Yes.

21        Q.    And they saw everything?

22        A.    Yes.  They were there, too.

23        Q.    Did your mother see you being stopped by the

24    police or did she come out afterwards after you were

25    handcuffed?

1      A.    She came out afterwards.

2      Q.    And how about Shawn and Ian Pinto, did they

3  see the whole thing or did they just see after you

4  were cuffed?

5      A.    They saw everything.  They were outside.

6      Q.    And when was the last time you talked to

7  them?

8      A.    I talked to Shawn last weekend.

9      Q.    So have you ever talked about this incident

10  with him?

11      A.    No.

12      Q.    And how about Mark E. Julius?

13      A.    He's in D.C.  So I haven't spoke to him.  He

14  goes to college in D.C.

15      Q.    How about Mark Pinto?

16      A.    Mark, that's Shawn's brother.  He's home

17  with Shawn.

18      Q.    So there's three of them, Shawn, Ian and

19  Mark?

20      A.    Yes.

21      Q.    And did Mark see everything?

22      A.    I don't recall what Mark seen.

23      Q.    And who is Alex Ronlin?

24      A.    Alex Roland.  That's my friend.  He

25  graduated with me from high school.

1    Q.   Did he also see this?

2    A.   He was out there, too.

3    Q.   One of the questions that was asked on the

4 interrogatories was whether or not you physically

5 resisted the police officers and whether you

6 cooperated.  It said you cooperated fully.  Do you

7 stand by that, that you did cooperate fully with the

8 officers?

9    A.   Rephrase the question.

10    Q.   Yeah.  Did you cooperate fully with the

11 officers or did you resist in any way?

12    A.   Well, I don't -- I don't understand what I

13 was being arrested for, so I don't know -- I didn't

14 know what was going on with anything.  I didn't know

15 what was going on.  So I don't know what you call

16 cooperation.  I don't know what you call

17 miscooperation.

18    Q.   Well, but that's what I'm saying.  The

19 answer that you gave is that you did cooperate, so you

20 must have understood that question.  The answer that

21 you gave in the interrogatories was that you

22 cooperated fully, was the answer you gave.

23    A.   I don't even know what you're talking about,

24 sir.

25    Q.   Okay.  Why don't I show you.

1          A.    I don't know what you're talking about.

2          Q.    Do you recall answering interrogatories and

3     production requests in this case?

4          A.    Are you talking to me --

5          Q.    Yes.

6          A.    -- or are you talking to yourself?

7          Q.    No.  I'm talking to you.

8          A.    What did you say?

9               MR. SZEREJKO:  Can you read that

10    question back, please.

11               (Record read.)

12         A.    Yes.

13    BY MR. SZEREJKO:

14         Q.    And what I'd like you to do, sir, is show

15    you page 16 of that document and ask you if that's

16    your signature.

17         A.    Yes.

18         Q.    And what I'd like to do is show you a

19    question and an answer that you gave under oath.  That

20    is question number 11.

21         A.    Oh.  I wasn't resisting anything.

22         Q.    Okay.  And do you stand by that answer to

23    number 11, that you cooperated fully with the

24    defendants?

25         A.    Yeah.

1     Q.   Okay.  So whatever they told you to do, you

2  did, correct?

3     A.   They told me to get out of the car.  No, I

4  wasn't about to get out of the car because there was

5  no rights read to me.

6     Q.   Well, once again, the answer that you gave

7  was that you cooperated fully.

8     A.   Right.

9     Q.   So one of the things that they asked you to

10  do was get out of the car and you didn't get out of

11  the car?

12     A.   They had no rights read to me.  If you come

13  up to me and tell me, get out of the car, am I

14  supposed to just get out of the car because you said

15  get out of the car?  Yes or no?  I'm asking you a

16  question just like you're asking me.  If you come up

17  on my car, jump out and say, get the F out of the car,

18  am I supposed to get out of the car because you told

19  me to get the F out of the car?

20          MR. FREEMAN:  I'm sorry, Joslyn.

21  You're not allowed to ask him a question.

22          THE WITNESS:  I don't like this right

23  now.  He's asking me questions and I can't ask him

24  questions.

25          MR. FREEMAN:  I understand, but that's

1    just the nature of this proceeding.  Like when I

2    question these officers, they'll do the same thing.

3            MR. SZEREJKO:  Right.  Thank you.

4    BY MR. SZEREJKO:

5        Q.   Mr. Robinson, I'm certainly not here to

6    argue --

7        A.   You can just carry on.  You don't have to

8    tell me what you're not here to do.  Just do your job.

9        Q.   And I'm trying to do my job and trying to

10   get you to answer some questions.

11           So you said that you were cooperating fully

12   and I was going through some of what they asked you to

13   do.  And one of the things that the officers there

14   asked you to do was get out of the car and you did not

15   get out of the car, correct?

16       A.   Yeah.  That's correct.

17           MR. FREEMAN:  I'm just going to object

18   to the form of that question just because at the time

19   I don't believe he knew they were officers.

20           THE WITNESS:  No.  There were no rights

21   read, no badges being shown or nothing.

22           But he's not saying that when he's asking

23   the questions, so that's why I'm asking him the

24   questions that I asked him.

25   BY MR. SZEREJKO:

1      Q.   And did they ask you to put your hands on

2    the car?

3      A.   Yeah.  He told me to put my hands on the car

4    once I got out.

5      Q.   Did you do that?

6      A.   I put my hands on the car, yes, I did.

7      Q.   And then when they began to pat you down,

8    did you --

9      A.   I hit his hand off of me and told him,

10   "Don't touch me."

11     Q.   And that was Henderson, correct?

12     A.   Yes.

13     Q.   And did you turn and attempt to run at any

14   time?

15     A.   All I did was hit his hand off.  If you call

16   this turning and trying to run, then you can call it

17   turning and trying to run.  But I hit his hand off and

18   turned back towards the car.  He tried to touch me

19   again, I hit his hand off.  He tried to search this

20   side, I hit his hand off.  Then he put his hand in my

21   pocket, he found a roll of condoms.

22     Q.   The record, so it's clear, you were doing a

23   gesture like you were slashing or slapping his hand

24   away, correct?

25     A.   Yes.

1    Q.    You did that on both the right and the left

2    side?

3    A.    Yes.

4    Q.    And to the best of your recollection, sir,

5    you never turned to run, correct?

6    A.    No.

7    Q.    The only turning you did was to move your

8    hands to cut his hands off, correct?

9    A.    Yes.

10    Q.    When you went back to St. Francis Hospital,

11    after the emergency room visit, did you go back there

12    on your own or were you requested to come back?

13    A.    I was requested to come back.

14    Q.    And you don't recall the name of any of the

15    doctors that you saw?

16    A.    No.

17    Q.    And when they told you to come back, do you

18    have any idea why they had you come back?

19    A.    I guess to see how I was doing.

20    Q.    When you went back the second time, what

21    took place?  What did they do?

22    A.    They looked at my bruises.  They looked at

23    my face.  They looked at my back.

24    Q.    Did they take any X-rays at that time?

25    A.    They took X-rays and the chiropractor took

1  X-rays, or the therapist or whatever, he took X-rays,
2  too.
3      Q.   Did they give you any treatment in the way
4  of medication when you went back to St. Francis
5  Hospital?
6      A.   I don't remember the prescription, no, I
7  don't.
8      Q.   You said that you yelled to one of your
9  friends to get your mother, and who was that you
10 yelled to?
11     A.   I don't remember which one of them.  I just
12 yelled to the boys over there to get my mother.  There
13 were three brothers.  And I guess one of them or all
14 three of them went and got my mother.
15     Q.   Do you recall anything else you said?
16     A.   No.
17     Q.   The police incident report indicates that
18 you were arrested for interfereing with the police and
19 breach of the peace.  Do either of those charges sound
20 familiar?
21     A.   I wasn't -- say that again?  Interfering
22 with the police?  Interfering with the police doing
23 what?
24     Q.   Well, the question is, do you recall being
25 arrested for interfering with the police?

1     A.    I recall being arrested. I don't know what

2    I was arrested for. And I told you that when you

3    asked me that earlier.

4     Q.    Right. And what I'm doing now, sir, is I'm

5    going through the report and I'm telling you what the

6    charges are --

7     A.    Right.

8     Q.    -- and maybe by telling you what they are,

9    you might remember them.

10     A.    Right.

11     Q.    That's my only purpose of doing it. I'm not

12    trying to trick you. I'm not trying to play games

13    with you. I am now just going through the police

14    report and asking if you remember the charges. Like

15    you said before, I'm just doing my job. Do you

16    understand that?

17     A.    Right.

18     Q.    So do you recall the charges, interfering

19    with the police, that you were filed against you?

20     A.    Yes.

21     Q.    And when did you first learn of those

22    charges?

23     A.    When I was leaving, when my mother came to

24    the jail and they were getting me out.

25     Q.    And do you recall the charge of breach of

1    peace?

2         A.    I recall being arrested.  The charges that

3    you're saying right now, maybe those were the charges

4    that they hit me with, but I don't recall -- I don't

5    know -- at the time I didn't know what was going on,

6    what I was getting arrested for or none of that.

7         Q.    And you, as best you can recall, you first

8    learned of those charges when you were leaving

9    Jennings Road; is that correct?

10        A.    Say that again.

11        Q.    You first learned of those charges when you

12   were leaving the police department that night?

13        A.    Yes.  When I was leaving, when my mother

14   came and got me.

15        Q.    And did the police explain to you that the

16   reason they stopped is they thought that they saw that

17   you had a gun stuck in your waistband area?

18        A.    They didn't start asking for no gun until

19   after I was cuffed.

20        Q.    But they did explain to you when you were on

21   Burton Street that that's what they thought they saw,

22   a gun, correct?

23        A.    When I was cuffed.  After they had already

24   slammed me, after there were no rights being read, no

25   badges shown, no cop clothes.

1    Q.    And then at that point, they said that they

2    were looking for a gun, correct?

3    A.    Right.  And I asked them, "What gun?

4    Whatever you were looking at was my cell phone.  You

5    have my cell phone in your hand.  Does that look like

6    a gun?"

7    Q.    And who was the officer that told you that

8    they were looking for a gun?

9    A.    They all said they were looking for a gun.

10   I don't remember which one said it.  They all said it.

11   Because they were telling my mother and my family

12   outside that they were looking for a gun.

13   Q.    The injuries to your back, sir, was it the

14   upper back or lower back?

15   A.    I don't remember.

16   Q.    And that would be the scrape, so you don't

17   recall what part of your back was scraped?

18   A.    Right.

19   Q.    Did you pay for the medical treatment you

20   received or did insurance pay for it?

21   A.    I didn't pay for anything.

22   Q.    So as far as you know, there was no

23   out-of-pockets for you, correct?

24   A.    Correct.

25   Q.    How about your lawyer?

1    A.    I haven't paid for anything.

2    Q.    And that would include the lawyer, correct?

3  That would include the lawyer as well as the medical

4  bills, correct?

5    A.    I have not paid for anything.

6    Q.    When you went to the ground, did any of the

7  police officers present fall to the ground with you?

8    A.    When I was slammed to the ground, he dragged

9  me from the car on my back, flipped me over.  When he

10  flipped me over, I was on my stomach and my face now,

11  like I'm laying down on a bed, like I'm laying flat

12  down.  And he collapsed down on top of me with his

13  knees on my back and then cuffed me.  Then, using his

14  hand, having my head into the ground.

15    Q.    And that would be the left side of your

16  face, correct?

17    A.    This side.

18    Q.    That would be the left side, right?

19    A.    Yes.

20    Q.    And it wasn't a situation where he fell to

21  the ground with you, he took you to the ground and

22  then went down on top of you; is that the case?

23    A.    He slammed me on my back.  He picked me up

24  and slammed me on my back, dragged me away from the

25  car, turned me over.  When he turned me over, I was

1    laying flat down, like I'm on top of the ground with

2    my stomach touching the ground because I had no shirt

3    on.  Then he fell down on top of me with his knees in

4    my back.  And then he cuffed me, using his hand to

5    push my head into the concrete.

6         Q.    That's why I asked that a couple of times

7    because you said he fell down.  I'm trying to

8    understand, did he fall down with you?  Did he fall

9    down on top of you?  You said he fell down on your

10   back; is that correct?

11        A.    He collapsed down on my back and put his

12   knees on my back.  Collapsed down with his knees and

13   put his knees on my back.

14        Q.    He fell down on top of you; is that what you

15   said?

16        A.    He collapsed down, fell -- collapsed and

17   fell is the same thing.  Okay.  You want me to say

18   fell?  He fell down on my back with his -- putting his

19   knees on my back and cuffed me.

20        Q.    Mr. Robinson, I'm trying to just -- you were

21   there.  I wasn't.  I'm just trying to learn what

22   happened.

23        A.    You're asking me the same questions, like,

24   five times.  And I'm giving you the same answer.  And

25   then you're using different words as if I'm going to

1   just --

2       Q.   That's not what I'm trying to do, sir.

3       A.   All right.  Next question.

4       Q.   I'm just --

5       A.   Next question.

6       Q.   No.  I control the questioning, not you.

7   And I'm just trying to learn what happened.  That's

8   all.  That's what the record shows.  There's no need

9   to become argumentative.

10      At any time were you punched in the face?

11      A.   No.  I was not punched in the face.

12      Q.   I take it, the only injuries you sustained

13  to your face was when your face was pushed into the

14  ground, correct?

15      A.   Yes.

16      Q.   At any time were you kicked?

17      A.   No.  I was not kicked.

18      Q.   Were you thrown to the ground just once?

19      A.   Yes.  Don't say thrown.  Say slammed.

20      Q.   And is it fair to say, sir, that at least

21  when the officers told you to get out of the car,

22  you -- because you didn't know they were police

23  officers, you refused to get out of the car initially,

24  correct?

25      A.   Yes, I did.

74

1        Q.     Did they at any time tell you to take your

2    hands out of your pockets?

3        A.     I never had my hands in my pockets.

4        Q.     Did they tell you to put your hands on the

5    car?

6        A.     Yes, they did.

7        Q.     Did you do that?

8        A.     Yes, I did.  Just when did I tell you that I

9    had my hands in my pocket?

10       Q.     I was asking you if you did.

11              Did you cooperate by giving your hands

12   backwards when they attempted to handcuff you?

13       A.     He pulled my hands back.  I was on the

14   ground when I was being cuffed.  I was in no control

15   of being cuffed.  I had no control over that.  At that

16   point in time I was on the ground, face down.  Where

17   am I going to try to inch and go?

18       Q.     Did you report any injuries you sustained to

19   the police officers?

20       A.     Report it to who?  What are you asking?

21       Q.     The police officers.  Did you tell them that

22   you were injured?

23       A.     No, I did not.  We had no conversation.

24       Q.     So, I take it, at no time did you ask to be

25   taken to the hospital and ask for medical attention,

1    correct?

2        A.   Ask who, the cops?

3        Q.   Yes.

4        A.   I never spoke to these guys once I was in

5    the cell to be asking them to take me to no hospital.

6        Q.   How about the officers out on the street?

7        A.   They saw how -- saw the damage that I was

8    in.  They were in no -- they had -- I guess they

9    had -- they were in no intention of taking me to the

10   hospital.  They brought me to a jail cell, Jennings

11   Road.

12       Q.   But I'm saying, you never told them that you

13   wanted to go to the hospital, correct?

14       A.   Yes, I did.  If that's what you're asking, I

15   did.  I mentioned it, that I wanted -- that I was

16   going to go to the hospital, yes, I did mention it.

17       Q.   No.  I'm saying did you ask the police

18   officers to take you to the hospital?

19       A.   No.  I did not ask the police officers to

20   take me to the hospital.

21       Q.   And you did not tell the police officers

22   that you were injured?

23       A.   No.  They saw the damage that was done.

24   They saw my eye and they saw my back because I had no

25   shirt on.  So they saw it.  There was no reason for me

1      to say, look at me.

2          Q.    That's not my question.

3                Did you tell the police officers that you

4      were injured?

5          A.    No.

6          Q.    Can you think of any witnesses, other than

7      the people that you've mentioned in response to the

8      interrogatories and production request?

9          A.    No.

10         Q.    And do you know any people who witnessed

11     what took place at Keney Park --

12         A.    No.

13         Q.    -- other than --

14         A.    No.

15         Q.    -- Ms. Williams?

16         A.    No.

17         Q.    Have you ever discussed this incident with

18     Ms. Williams?

19         A.    No.

20         Q.    Since the day it happened, you never talked

21     about it?

22         A.    Once or twice.  Recently, have we discussed

23     it?  No.

24         Q.    When was the last time you talked about it?

25         A.    I don't remember.

1    Q.    Did you do anything to prepare for today's

2    deposition?

3    A.    No.  No reason to.  If you really want to

4    know, I have exams all this week.  Right now, you're

5    holding me from my exams, from my classes.

6    MR. SZEREJKO:  All right.  I think

7    other than finishing up with that authorization for

8    his employment --

9    BY MR. SZEREJKO:

10    Q.    Can you give me the address of the Athletes

11    Foot that you worked at?

12    A.    I don't remember it.  It was Buckland Mall.

13    Q.    Do you remember the name of your manager or

14    supervisor?

15    A.    Her name was Torsa, T O R S A.

16    Q.    Do you know if she's still there?

17    A.    No.  She's not there anymore.

18    MR. SZEREJKO:  Okay.  I think that will

19    do it.  Thank you.

20    MR. FREEMAN:  Nothing.  No questions.

21    (Whereupon, the deposition was

22    concluded at 3:20 p.m.)

23

24

25

1      <u>CERTIFICATE OF DEPONENT</u>

2

3          I, JOSLYN ROBINSON, have read the foregoing

4      transcript of the testimony given at the deposition on

5      Wednesday, March 24, 2004, and it is true and accurate

6      to the best of my knowledge and/or with the changes as

7      noted in the attached errata sheet.

8

9                     _____

10                     JOSLYN ROBINSON

11         Subscribed and sworn to before me this _____

12     day of _____, 2004.

13

14                     _____

15                     Notary Public/Commissioner of Deeds

16     My Commission Expires:

17

18     _____

19     CIVIL ACTION NO. 3:02CV2120 (AWT)
       JOSLYN ROBINSON
20     vs.
       OFFICER HENDERSON,
21     THE CITY OF HARTFORD,
       BRUCE MARQUIS,
22     JOHN DOE OFFICERS
       JOSLYN ROBINSON, (PM), MARCH 24, 2004
23     LBG

24

25

1            C E R T I F I C A T E

2        I, Leigh B. Gershowitz, License #306, a Notary

3    Public for the State of Connecticut and Commonwealth

4    of Massachusetts, do hereby certify that the

5    deposition of JOSLYN ROBINSON, was taken before me

6    pursuant to Federal Rules of Civil Procedure, at the

7    offices of Halloran & Sage, LLP, One Goodwin Square,

8    225 Asylum Street, Hartford, Connecticut 06103,

9    commencing at 2:00 p.m. on Wednesday, March 24, 2004.

10       I further certify that the witness was first

11   sworn by me to tell the truth, the whole truth, and

12   nothing but the truth, and was examined by counsel,

13   and his testimony was stenographically reported by me

14   and subsequently transcribed as herein before appears.

15       I further certify that I am not related to the

16   parties hereto or their counsel, and that I am not in

17   any way interested in the events of said cause.

18       Witness my hand this ____12ᵗʰ____ day of April,

19   2004.

20

21                     _____

22                     Leigh B. Gershowitz, Notary Public

23   My Commission Expires:        My Commission Expires:
24   May 13, 2005 (In MA)          May 3, 2008 (In CT)

25

                    NIZIANKIEWICZ & MILLER
                       (860) 291-9191

# EXHIBIT B

INCIDENT REPORT

CASE # 01-37308 CC

INTERFERING WITH POLICE

**LOCATION:** 68 BURTON ST.

ARREST 1: ROBINSON, JOSLYN
68 BURTON ST
CHARGE 1: BREACH OF PEACE  5/15/02
STATUTE 53A-181

INTERFERING WITH POLICE  53A-167C

UNDERSIGNED

1993 Chevy  4 DOOR  BLUE

**INCIDENT DETAILS:** ON THE ABOVE DATE AT THE LISTED TIME, THE UNDERSIGNED OFFICER'S/DETECTIVE'S WHILE ASSIGNED TO THE JOINT HARTFORD POLICE DEPT. AND CONN. STATE POLICE ENFORCEMENT INITIATIVE WERE TRAVELING NORTH ON BURTON ST. IN AN UNMARKED POLICE VEHICLE, THAT THE AREA IS KNOWN FOR STREET LEVEL NARCOTICS DEALINGS AND RELATED OFFENSE'S, THAT THE UNDERSIGNED JOHNSON OBSERVED THE ACCUSED ABOUT TO GET INTO THE DRIVER'S SIDE OF THE LISTED VEHICLE, THAT THE UNDERSIGNED JOHNSON OBSERVED FROM SAME, THAT THE UNDERSIGNED JOHNSON APPEARED TO GO INTO WAISTBAND AND PULL AN ITEM THE UNDERSIGNED ALONG WITH DET. HENDERSON THOUGHT A GUN IN THE WAISTBAND OF THE ACCUSED APPROACHED THE ACCUSED AS HE STEPPED OUT OF THE VEHICLE AND EXPLAINED THE REASON FOR STOPPING HIM, DET. HENDERSON THEN FOR HIS AND OTHER OFFICER'S SAFETY ASKED THE ACCUSED THE REASON FOR THE BULGE THE UNDERSIGNED LOOKED QUICKLY BEGAN TO STRUGGLE WITH DET. HENDERSON AT WHICH TIME THE ACCUSED ING THE ACCUSED THE ACCUSED HANDCUFFED HE THEN BEGAN YELLING TO PERSONS STANDING BY FOR HIS PANTS TO COME GET HIM, THAT A SMALL CROWD GATHERED IN WHICH MARKED HPD UNITS TAKE SKILLS TAUGHT IN HIS HPD TRAINING, THAT THE ACCUSED WAS HANDCUFFED HE THEN BEGAN YELLING TO PERSONS STANDING BY FOR HIS

PAGE 1 OF 2 PAGES

INVESTIGATING OFFICER: A. MARTINEZ
ASSISTING OFFICER: A. HENDERSON

PLAINTIFFS
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 7/7/03
RPTR:

UNITS WERE CALLED FOR ASSISTANCE. THE ACCUSED WAS VERY LOUD AND OBNOXIUS AND ATTEMPTED TO AGITATE THE CROWD WITH SUGGESTIONS OF VIOLENCE AGAINST THE POLICE. HE WAS QUICKLY REMOVED FROM THE SCENE. AS TO HELP CONTROL THE ESCALATING SITUATION. THE ACCUSED WAS THEN TRANSPORTED TO HPD DETENTION WITHOUT FURTHER INCIDENT. THE ACCUSED AT THE TIME OF HIS ARRE... DID NOT REPORT ANY INJURIES, NOR WERE ANY OF THE UNDERSIGNED INJURED DURING THIS SITUATION. LET IT BE NOTED THAT THE ACCUSED STATED TO DET. HENDERSON "GET YOUR FUCKING HANDS OFF OF ME." DURING THE PAT DOWN.

CASE # 01-37308 CC

HARTFORD POLICE

PAGE 2 OF 2 PAGES

INVESTIGATING OFFICER  R. JOHNSON / A. HENDERSON

ASSISTING OFFICER  A. MARTINEZ

CODE # A2.2 / A75

EXHIBIT C

1       A       This vehicle cut off.

2       Q       Cut off in front.

3               What happened after that van pulled up in front

4       of you?  What happened?

5       A       Some men jumped out with guns and was telling him

6       to get the -- excuse my language, but, "Get the fuck out

7       the car."  He's asking why.  I'm going to turn off -- take

8       his keys out the engine.  They was trying to pull him out

9       the car.

10      Q       Did you have any idea who these men were?

11      A       No.  There wasn't any type of identification.

12      Q       How many men were there?

13      A       Five.

14      Q       And you're certain there were five?

15      A       Five.

16      Q       First of all, there were no females; they were

17      all men; correct?

18      A       Correct.

19      Q       Do you recall the racial makeup of those men?

20      Were they black?  White?  Hispanic?

21      A       Majority I want to say were African-American.  I

22      remember one Hispanic.

23      Q       Were there any whites?

24      A       I don't remember.

25      Q       Miss Williams, you know from television, maybe

EXHIBIT D 1

1    Q    And you did not do a strip search?

2    A    No.

3    Q    And you were there the whole time; no one did a

4    strip search?

5    A    No one did a strip search of Mr. Robinson, sir.

6    Q    What is your height and weight, Detective?  What

7    was it back in July of '01? is really what I'm interested

8    in.

9    A    Back in July of '01?

10    Q    Yes.

11    A    I'm six three, that's not ever going to change.

12    Weight fluctuates.  '01, about 250.

13    Q    Ever do any weight training?

14    A    Yes, sir.

15    Q    Any martial arts?

16    A    No, sir.

17            MR. FREEMAN:  I think I'm done, Jim.

18            MR. SZEREJKO:  Reserve my questions for the

19    time of trial.

20            (The deposition concluded at 3:20 p.m.)

21

22

23

24

25

1    Mr. Robinson's vehicle?

2        A    When Detective Johnson first said he saw?

3        Q    Yes, when he first said, I see a gun in the waist

4    band?

5        A    I'd say about 30 feet away.

6        Q    Did anyone use binoculars at that time or it was

7    just eye viewing?

8        A    No, it was just plain view, eye vision.

9        Q    If you know, had Detective Johnson ever met

10   Mr. Robinson before?

11       A    I don't know that, sir.

12       Q    I'm going to have to ask you, the other two

13   officers or detectives or the trooper in the van, the other

14   people in the van, did any of them know Mr. Robinson to your

15   knowledge?

16       A    I don't know that, sir.

17       Q    So after Detective Johnson said that, I think

18   you said he saw a gun in the waist band?

19       A    That's what he said, I believe he saw a gun in

20   the waist band of Mr. Robinson.

21       Q    What did you do after he said that, if anything?

22       A    I asked him again, I asked him was he sure if

23   that's what he actually saw.

24       Q    What did he say?

25       A    He said yes.

EXHIBIT D 3

1   could get out of the van and at the same time prevent

2   Mr. Robinson from leaving.

3         We then get out of the van.  I'm the first one up

4   to the driver's side door.  I pull out my badge, and I

5   identify myself as Hartford Police.  By that time

6   Mr. Robinson already had the vehicle turned on.

7         I then notified, I then informed him of why we

8   were approaching his vehicle, why we were stopping him, and

9   I asked him to turn the car off.  I'm not sure, I can't

10  recall if he turned it off or if after several times I asked

11  him to turn it off, I think I reached inside and cut it off

12  myself after he didn't do it, I'm not sure.

13        Like I said, once I was pulling him out, I then

14  told him why we were stopping him.  As I was escorting him

15  out of the vehicle, I let him know what Detective Johnson

16  saw, and I told him if he doesn't have a gun in the vehicle,

17  this is just a waste of his time and he will be on his way.

18  But we have to check because we are going on what Detective

19  Johnson believed he saw.

20        He said okay.

21        I put --

22  Q     Mr. Robinson said okay?

23  A     Yes.  I then told him to put his hands on the

24  hood of the car, which he complied.

25        And what I usually do is, being in narcotics, we